# EXHIBIT G

**TERM SHEET**
**FINANCING FOR BRON DIGITAL SERIES ENTITLED**
**"BUBBLES HOTEL"** (the **"Project"**)

Dated as of May [___], 2020

| | |
|---|---|
| **Media Fund:** | Creative Wealth Media Finance Corp. (the "Media Fund"), wishes to obtain financing from Investor in connection with the production of the Project. |
| **Underlying Beneficiary** | Bubble Up Productions, Inc. ("Underlying Beneficiary") |
| **Media Fund Loan** | The Media Fund has provided the Underlying Beneficiary with a loan, inclusive of a Facilitation Fee of USD$5,442,301. |
| **Investor:** | Robert Scot Building Venture LLC (the "Investor") |
| **Loan:** | Subject to satisfaction of certain conditions precedent, as more fully set forth in a subsequent agreement, Investor will advance to Media Fund the amount of $750,000 USD representing 13.78% of the overall $5,442,301 loan (inclusive of the Facilitation Fee) (the "Loan"). |
| **Interest Rate:** | The Investment will bear interest at a rate of 10% per annum (the "Interest"). |
| **Term** | The term of the Loan shall be 24 months. |
| **Facilitation Fee** | The Loan shall include a fee equal to five percent (5.0%) (the "Facilitation Fee"): the Facilitation Fee shall be used to pay the costs and expenses of the legal fees and administrative fees incurred in the administration, oversight and reporting of the performance of the Investment by the Media Fund. |
| **Source of Repayment** | The Loan, inclusive of the Facilitation Fee, the Interest and the Net Profit Participation shall all be recouped from gross receipts generated by the Project, if any, in accordance with the Allocation of Defined Gross Receipts as defined herein. |
| **Budget** | The final budget (inclusive of the contribution from the Chinese co-production partner) for the Project will not exceed USD$9,511,245 (of which $5,191,504 shall be funded from the Media Fund Loan). Investor shall not be responsible for any expenditures in excess of the budget, if any. |

| | |
|---|---|
| **Use of Investment:** | Proceeds of the Loan, less the Facilitation Fee, shall be used exclusively to finance the pre-production, production, post-production, and delivery of the Project. |
| **Project Specifications:** | The Project shall have the following specifications:<br><br>1. Be based on the concept created by Narae Ha.<br>2. Production overseen by Epic Story Media.<br>3. Have an MPAA rating no more restrictive of TV-G or TV-Y7. |
| **Allocation of Defined Gross Receipts** | Defined Gross Receipts, exclusive of all tax credit proceeds, as identified in the finance plan, used to repay the tax credit financier, shall be allocated as set forth in the Waterfall attached as Schedule A. |
| **Net Profit Participation:** | Net Profits, shall be defined as set forth in the Waterfall attached as Schedule A. 13.78 % of Twenty-five percent (25%) of Net Profits (as defined in the Waterfall) due Media Fund shall be allocated to Investor. |
| **Media Fund Representations and Warranties:** | a. There is no action, suit or proceeding (actual or threatened) at law or in equity or by or before any governmental instrumentality or other agency concerning the Project, or any investigation of the affairs concerning the in any respect.<br>b. Underlying Beneficiary owns all right, title and interest necessary to make, distribute, exhibit and otherwise exploit the Project throughout the universe.<br>c. The Project will be completed and delivered and will be technically acceptable to premium SVOD exhibitors and broadcasters U.S. and elsewhere.<br>d. Media Fund a duly constituted, registered and organized company and is in good standing under the laws governing it, and has the right and authority to enter into this Term Sheet and to grant the rights provided to Investor set forth herein |
| **Investor Representations and Warranties** | a. Investor is an "Accredited Investor" as defined in OSC Rule 45-501.<br>b. Investor has relied on its own examination of the investment hereunder including, but not limited to, the LSA and the merits and risks involved. Investor is aware that it may be required to bear the financial risks of this investment for an indefinite period of time. |
| **Additional Standard Terms** | A long form agreement memorializing the term hereof, if any, shall include such terms as are standard in connection with investment |

|  | agreements in the motion picture and television industries, including but not limited to: standard affirmative covenants such as ongoing financial reporting obligations from the Media Fund, audit rights for Investor and notice of material changes, standard negative covenants, indemnification of Investor and remedies for breach. |
|---|---|
| **Confidentiality:** | The parties shall maintain at all times as confidential information the terms of this Term Sheet and the content of any negotiations between them, except that both parties may inform their respective advisors, regulatory authorities, counsel, lenders, or other equity holders and employees with a need to know as each party deems necessary (provided that all such persons are made aware of and agree to abide by the confidentiality hereof). |
| **Governing Law:** | This Term Sheet will be governed by the laws of the Province of Ontario. |
| **Other:** | All terms of this Term Sheet shall be legally binding agreements of the parties hereto. |
|  | This Term Sheet may be executed in one or more counterparts, whether holographically or electronically and may be sent by portable document format ("PDF"), each of which shall constitute an original hereof and which together shall constitute one agreement. |

Agreed and accepted as of the date written above.

CREATIVE WEALTH MEDIA FINANCE CORP.

By: _[signature]_

Name: Jason Cloth


[INVESTOR] Robert Scot Building Venture LLC

By: _[signature]_

Name: Robert Harris, Manager

---

Investment Term Sheet  
BUBBLES

3

Confidential

## SCHEDULE A

## WATERFALL

For the purposes of this Schedule A, the following definitions shall apply:

| | |
|---|---|
| "Administrative Agent" | Bron Releasing Inc. |
| "BUPI" | Bubble Up Productions Inc. |
| "BUPI Territory" | The world excluding the Chinese Territory, the Domestic Territory and the EE Territory and all aircraft, ships and oil rigs flying the any such flag. |
| "Chinese Territory" | People's Republic of China (including the Special Administrative Regions of Macao and Hong Kong) and Taiwan. |
| "Chinese Territory Net Revenues" | 20% of all monies payable to BUPI from the exploitation of the Series in the Chinese Territory, which such amounts are net of all applicable sales and other fees (including Deferred Distribution Fee) as set forth in Article 7 of the Cooperation Agreement. |
| "Cooperation Agreement" | The cooperation agreement dated [ May 5 ], 2020 between HPSI and EE; |
| "Collected Gross Receipts" | All monies or any other proceeds (including, but not limited to, advances, guarantees, license fees, overages and deposits and any other revenues generated by the Project without any deduction) derived from any Distribution Agreement or from any other source of exploitation in the Territory relating to the Project or the Rights, including, but not limited to merchandising, publishing, soundtrack and ancillaries, but specifically excluding any Tax Credits and any Tax Credit Proceeds (other than the Tax Credit Excess, insurance proceeds and claim recoveries, each of which shall be included in Gross Receipts but such Tax Credit Excess shall not be subject to Items 1-4 in Schedule 5) and actually received or deemed received |
| "CWMF" | Creative Wealth Media Finance Corp. |
| "CWMF Loan" | The financial facility consisting of a principal amount of US$5,191,504 plus interest and costs in connection thereto, made available by CWMF to finance the cost of production of the Series, provided that for the purposes hereof, the exact amount outstanding shall be as notified by CWMF to BUPI from time to time. |
| "Distribution Agreement" | The distribution agreement dated [ May 5 ], 2020 between BUPI, EE, and Distributor. |
| "Distribution Fees" | An amount equal to 10% of Gross Revenues. |

| | |
|---|---|
| "Deferred Distribution Fee" | Not more than 30% of Gross Revenues (if the sale is made directly), or not more than 40% of Gross Revenues (if the sale is made by an arm's length distributor or sub-agent). |
| "Distributor" | Epic Story Media Distribution Inc. |
| "Domestic Territory" | Canada, and the United States. |
| "EE Territory" | Malaysia, Cambodia, Indonesia, Philippines, East Timor, Laos, Singapore, Vietnam, Brunei, Burma and Thailand, their respective territories, possessions, commonwealths and protectorates, all diplomatic, military, industrial and government posts, bases and installations (wherever located) |
| "EE Territory Net Revenues" | 45% of all monies payable to BUPI from the exploitation of the Series in the Chinese Territory, which such amounts are net of all applicable sales and other fees (including Deferred Distribution Fee) as set forth in Article 7 of the Cooperation Agreement. |
| "Project" | Season one (1) of the animated television series entitled "*Bubble's Hotel*". |
| "EE" | Entire Entertainment. |
| "ROW Territory" | The Territory excluding the BUPI Territory, the EE Territory, the Chinese Territory and the Domestic Territory. |
| "Rights" | all copyright, distribution and similar rights in and to the Picture and all ancillary rights or associated rights thereto (excluding remake, sequel, prequel and any other subsequent production rights and the underlying rights thereof) including, without limitation, gaming, novelization, merchandising (excluding Toy Revenues, which shall be accounted for separately), mobile, soundtrack, stageplay and music publishing rights. |
| "Territory" | The world. |

## SCHEDULE A

### Distribution of Collected Gross Receipts

All Collected Gross Receipts shall be distributed by the Epic Parties to the beneficiaries below in the following manner and order:

**PART I. Distribution of Collected Gross Receipts from the Domestic Territory**

1. To the payment of Distribution Fees, which shall be allocated as follows:
   a. 7.5% to Distributor; and
   b. 2.5% to Administrative Agent; thereafter

2. To CWMF in repayment of the CWMF Loan; thereafter

3. In payment of the Deferred Distribution Fee, which shall be paid retroactively accounting for the Distribution Fee already paid under Paragraph 1, to be allocated as follows:

   a. 2.5% to CWMF;
   b. 2.5% to Administrative Agent; and
   c. the balance to Distributor; thereafter

4. If the distribution fee charged by BUPI, as between BUPI and EE, exceeds the Deferred Distribution Fee, the difference shall be allocated as follows:
   a. 35% to CWMF; and
   b. 65% to BUPI

5. The remaining balance shall be referred to as "Domestic Net Profits" and shall be applied and distributed as follows:

   a. 20% to EE.
   b. 80% to BUPI, to be allocated as follows:
      i. 28% to CWMF; and
      ii. 52% to BUPI

**PART II. Distribution of Collected Gross Receipts from the ROW Territory**

1. To the payment of Distribution Fees, which shall be allocated as follows:
   a. 7.5% to Distributor; and
   b. 2.5% to Administrative Agent; thereafter

2. To CWMF in repayment of the CWMF Loan (to the extent not repaid pursuant to Part I, Section 2 above); thereafter

3. In payment of Deferred Distribution Fee, which shall be paid retroactively accounting for the Distribution Fee already paid under Paragraph 1, to be allocated as follows:

    a. 2.5% to CWMF;
    b. 2.5% to Administrative Agent; and
    c. the balance to Distributor; thereafter

4. If the distribution fee charged by BUPI, as between BUPI and EE, exceeds the Deferred Distribution Fee, the difference shall be allocated as follows:
    a. 35% to CWMF; and
    b. 65% to BUPI

5. The remaining balance, shall be referred to as "ROW Net Profits" and shall be applied and distributed as follows:

    a. 45% to EE; and
    b. 55% to HSPI, to be allocated as follows:
        i. 19.25% to CWMF; and
        ii. 35.75% to BUPI

**PART III. Distribution of Chinese Territory Net Revenues**

1. To CWMF in repayment of the CWMF Loan (to the extent not repaid pursuant to Part I, Section 2; or Part II, Section 2); thereafter

2. The remaining balance, shall be referred to as "Chinese Net Profits" and shall be applied and distributed as follows:

    a. 35% to CWMF; and
    b. 65% to BUPI

**PART IV. Distribution of EE Territory Net Revenues**

1. To CWMF in repayment of the CWMF Loan (to the extent not repaid pursuant to Part I, Section 2; or Part II, Section 2; or Part III, Section 1); thereafter

2. The balance shall be referred to as "EE Net Profits" and shall be applied and distributed as follows:

    a. 35% to CWMF; and
    b. 65% to BUPI

**CREATIVE WEALTH MEDIA FINANCE CORP.**
**PARTICIPATION AGREEMENT**

**AGREEMENT** made this ___1___ day of _March_, ~~2020~~ 2021 by and between **CREATIVE WEALTH MEDIA FINANCE CORP.**, a Canadian corporation, provincially registered in the Province of Ontario with its office at 151 Bloor Street West, Suite 700, Toronto, Ontario M5S 1S4 (hereinafter referred to as "**Lender**") and _Robert Scot Building Venture LLC_, a US Individual residing at _PO Box 444, Jupiter, FL 33458_ (hereinafter referred to as "**Financier**").

**WHEREAS:**

A. Lender has entered into a term sheet agreement (hereinafter referred to as the "**Master Term Sheet**") with Bubble Up Productions Inc (hereinafter referred to as the "**Borrower**") in respect of a Television Series Project production entitled "Bubbles Hotel" (hereinafter referred to as the "**Picture**"), a true copy of said Master Term Sheet having been delivered to Financier, and Financier having independently reviewed and approved same;

B. Pursuant to the terms of the Master Term Sheet (together with any amendments, supplements, extensions and renewals thereof, and any related agreements, security agreements, documents and instruments, hereinafter collectively referred to as the "**Financing Agreements**"), Lender has entered and/or will enter into certain financing arrangements and has extended and/or will extend a loan of $5,442,301 USD to the Borrower (hereinafter referred to as the "**Loan**"), upon certain collateral security including the present and future accounts of the Borrower (the "**Collateral**"); and

C. Pursuant and subject to the term sheet agreement, entered into between the Financier and Lender dated as of _March 1, 2021_, ~~2020~~ (hereinafter referred to as the "**Client Term Sheet**") attached hereto and incorporated into this Agreement by way of Schedule "A", Financier wishes to acquire from the Lender, upon the terms and conditions hereinafter set forth, an undivided fractional interest in the Loan, and to the extent necessary to repay the Participation (as hereinafter defined), an undivided fractional interest in the Collateral.

**NOW, THEREFORE**, in consideration of the premises and the mutual covenants and promises herein contained, and for other good and valuable consideration (the receipt and sufficiency of which are hereby acknowledged by each of the parties), the parties hereto agree as follows:

1. (a) Lender hereby sells to the Financier and the Financier hereby agrees to purchase from the Lender an undivided fractional interest in the aforementioned Loan (the "**Participation**"). The Participation will be pro rata based on the amount offered by each Financier (hereinafter referred to as the "**Participation Advance**") as a percentage of the total amount offered by the Lender to the Borrower under the Loan.

   (b) The relationship between Lender and Financier is and shall be that of a seller and purchaser of an undivided fractional interest (i.e., an outright sale and assignment by Lender to Financier of an interest the Loan, together with the Collateral therefor), not a debtor-creditor relationship. Accordingly Lender has not guaranteed repayment to Financier of, nor agreed to repurchase from Financier, any portion of the Participation at any time.

2. Financier agrees that Lender will retain in Lender's name, but to the extent of the Participation, on behalf of Financier, all of the obligations of the Borrower to Lender arising out of the Financing Agreements, and Lender will, in its name, collect and receive payments with respect to the Loan and of any amounts paid or recovered from (a) the Borrower pursuant to the Financing Agreements, (b) any guarantor or other entity liable in respect of the obligations of the Borrower under the Financing

- 2 -

Agreements, or otherwise, and (c) the recovery or realization on any Collateral or other property, rights and claims in favour of Lender or which may be received by or may come into the possession of Lender; provided that any such amounts are applicable to the payment or discharge of any of the obligations of the Borrower pursuant to the Financing Agreements or otherwise (all of the foregoing being hereinafter called "**Collections**").

3. (a) Financier shall participate in the Collections and be repaid principal and interest and share in "Adjusted Gross Revenues" derived from exploitation of the Picture, on and subject to the terms provided in Schedule "A" to the extent of its Participation.

   (b) To the extent of the Participation, Lender is and shall be a trustee and agent for Financier in administering and servicing the Financing Agreements and all rights, remedies and benefits thereunder, including making the Loan, the perfection of security interests and other liens in the Collateral, receiving Collections, execution of agreements in connection therewith and the exercise of all other rights and remedies of a lender and secured party with respect thereto.

   (c) Lender shall have the obligation to account to Financier for Financier's share of the Collections. All Collections and/or payments received by Lender with respect to Financier's interest in the Loan, including proceeds of Collateral and claims with respect thereto, which are received by Lender shall be held in trust for Financier and deposited by Lender in one or more of its bank accounts and applied as provided herein.

4. (a) Lender's books and records showing the account between Lender and the Borrower and statements of account rendered to Financier shall be considered accurate unless objected to by Financier within sixty (60) days from their date

   (b) Lender agrees to pay and otherwise account to Financier on or about fifteen (15) calendar days after Lender's actual receipt of amounts due and payable to Lender pursuant to the Financing Agreements, amounts due and payable to Financier, pursuant to the Client Term Sheet in respect of the Participation, as such amounts are earned and paid by the Borrower to Lender, pursuant to the terms of the Financing Agreements.

5. Financier represents and warrants as follows to the Lender at the date of this Agreement and at the date the Financier provides the amount of the Participation Advance to Lender by way of certified cheque, bank draft or wire transfer or such other method of payment acceptable to Lender, or such other date and time as may be determined by Lender (hereinafter referred to as the "**Closing Date**") and acknowledges and confirms that the Lender is relying on such representations and warranties in connection with this Agreement:

   (a) Financier is entitled to receive all payments hereunder without Lender being required to deduct or withhold any amount therefrom on account of duties, taxes, levies, imports, fees, interest or penalties (each a "**Tax**" and collectively "**Taxes**"). If any deduction or withholding for Taxes is required by law or the administrative practice of any taxation authority, Canadian or otherwise, Lender shall be entitled to make such deduction or withholding from any payment hereunder and to pay the full amount so deducted or withheld to the relevant taxation authority in accordance with applicable law. Financier shall notify Lender immediately if any Taxes are required to be deducted or withheld upon any payment to Financier hereunder and shall provide any certificates, Tax forms or other information reasonably requested by Lender in connection with the reporting or payment of any Taxes relating to this Agreement. Financier shall indemnify Lender on demand on an after-Tax basis for all losses, claims, liabilities, Taxes or expenses incurred by Lender as result of (i) any failure by the Financier to comply with any Tax reporting or payment requirements relating to this Agreement; (ii)

- 3 -

any inaccuracy of the foregoing representation and warranty and (iii) any payment by Lender to Financier hereunder with the required deduction or withholding for Taxes.

(b) The Participation has not been made through, or as a result of, and is not being accompanied by, (i) a general solicitation, (ii) any advertisement including articles, notices or other communications published in any newspaper, magazine or similar media or broadcast over radio or television, or (iii) any seminar or meeting whose attendees have been invited by general solicitation or general advertising.

(c) None of the amounts that the Financier is committing to pay to the Lender are to the knowledge of the Financier, proceeds obtained or derived, directly or indirectly, as a result of illegal activities.

(d) If the Financier is an individual, he or she is of legal age and is legally competent to execute, deliver and perform his or her obligations under this Agreement. If the Financier is not an individual, (i) it has the legal capacity and competence to execute, deliver and perform its obligations under this Agreement; and (ii) the execution and delivery of and performance by the Financier of this Agreement have been authorized by all necessary corporate or other action on the part of the Financier;

(e) If the Financier is committing on its own behalf, this Agreement has been duly executed and delivered by the Financier, and constitutes a legal, valid and binding agreement of the Financier enforceable against him, her or it in accordance with its terms;

(f) The execution and delivery of and performance by the Financier of this Agreement does not and will not (or would not with the giving of notice, the lapse of time or the happening of any other event of condition) result in a breach or violation of or a conflict with, or allow any other person to exercise any rights under any of the terms or provisions of the Financier's constating documents or by-laws, if applicable, or any other contract, agreement, instrument, undertaking or covenant to which the Financier is a party or by which it is bound; and

6. Financier hereby agrees the provisions related to the Interest, Maturity Date, recuperation of and/or amount entitled to under the Repayment Amount in the Client Term Sheet, collectively, represent all material aspects and/or rights associated with the Loan. As such, Lender agrees and shall not, without prior written consent in each instance, amend, alter, modify, waive or release any material right, aspect of, or relating to the Interest, Maturity Date, recuperation of and/or amount entitled to under the Repayment Amount. Furthermore, Financier confirms and acknowledges that the Lender is relying on such agreement in connection with the execution of this Agreement

7. Financier shall pay all stamp duty, documentation, registration, transfer or other like Taxes, if any, which may now or hereafter be imposed in connection with this Agreement or the purchase of the Participation and shall indemnify Lender on demand on an after-Tax basis against any liability resulting from any delay or failure by Financier to pay such Taxes. Financier's obligations under this Section shall survive the termination of this Agreement.

8. Financier hereby agrees that Lender shall have the right to carry out the provisions of the Financing Agreements with the Borrower, and to exercise all rights and privileges accruing to it by reason of the provisions thereof, and to enforce its rights thereunder for the joint benefit of Lender and Financier, according to its discretion and the exercise of its business judgment, in accordance with its normal operating procedures.

(a) Financier further acknowledges the risks inherent in making loans and/or equity investments in the Picture and the related risks inherent in developing, producing, and marketing the Picture, including

- 4 -

but not limited to the possibility of cost overruns, lower sales than anticipated and loss of financing. Lender makes no representation or warranty as to the commercial release of the Picture or the amount of proceeds, if any, to be received from exploitation of the Picture. There is no assurance that Financier will earn a profit from or recoup its Participation. Lender agrees that it will use normal prudence and judgment in the servicing of the account and in the carrying out of the terms of the Financing Agreements. Lender shall not have any liability to Financier with respect to any action taken or omitted by Lender, its employees or agents, in connection with the Financing Agreements or for any error in judgment except for its own gross negligence or wilful misconduct. Lender does not assume, and shall not have, any responsibility or liability, express or implied, for the enforceability or collectability of the Financing Agreements, the Collateral or the condition of the Borrower or guarantors or any obligor, financial or otherwise, or the Collateral, or for the accuracy of any credit or other information furnished by the Borrower unless Lender has acted with gross negligence or wilful misconduct. Financier acknowledges that it may make its own independent investigation of the Borrower and that it will be given access to all information with respect to the Borrower and Lender that it wished to have and an opportunity to make such inquiry of the Borrower as to Borrowers' condition and the arrangements between the Borrower and Lender and inquiry of Lender in connection therewith as Financier determines to be necessary or appropriate. The Financier is not relying on the Lender, its affiliates or counsel to any of them in this regard.

9. Lender agrees that at any time and from time to time during normal business hours, it will permit Financier or its agent to examine Lender's books, records and accounts relating to the Collateral and the Financing Agreements and it will upon request furnish Financier with such information requested as it may have or be reasonably able to obtain with respect to the Collateral or any other matter connected with the Financing Agreements and with copies of all papers and documents relating to the Collateral and the transactions in them and with financial statements and audit reports showing the status of the Collateral. Financier agrees that it will keep all such information confidential.

10. Lender shall not, without the prior written consent of Financier, offset any claim or demand in favour of Lender or of any other client of Lender pertaining to indebtedness or obligations of Borrower wherein Financier does not participate, against or to the detriment of Financier, Financier shall not, without the prior written consent of Lender, offset any claim or demand in favour of Financier against or to the detriment of Lender or to the detriment of any credit balances for or to the account of the Borrower. In the event of any claim or action arising out of this Agreement, both Lender and Financier agree not to deduct, counterclaim or set-off any amounts which may be owed on account of other dealings between them; and, similarly, no amounts owing under this Agreement shall be deducted counterclaimed or set-off on account of other dealings between Lender and Financier.

11. This Agreement shall be binding upon and inure to the benefit of the successors and permitted assigns of the parties hereto and shall be governed and interpreted in accordance with the laws of the Province of Ontario and the federal laws of Canada applicable therein.

12. Financier shall not sell, pledge, assign, sub-participate or otherwise transfer its rights under this Participation Agreement, the Collateral, or the Collections, without the prior written consent of Lender.

13. Nothing contained herein shall confer upon Lender or Financier any interest in, or subject either of them to any liability for, or in respect of the business, assets, profits, losses or liabilities of the other, except only as to the Participation.

14. All notices, requests and demands to or upon the respective parties hereto shall be deemed to have been duly given or made: if by hand, immediately upon sending; if by overnight delivery service, one

- 5 -

(1) day after dispatch; and if mailed by registered mail, return receipt requested, five (5) days after mailing. All notices, requests and demands are to be given or made to the respective parties at the address set forth herein; if to Lender, to the attention of:

Creative Wealth Media Finance Corp.

151 Bloor St West Suite 700, Toronto, Ontario M5S 1S4

<u>Attention</u>: Jason Cloth

if to Financier, to the attention of

Robert Harris
_____

15. Each of the parties hereto confirms that it has no loans or financing transactions with the Borrower, or any guarantor except those transactions which are the subject of this Agreement or have been disclosed in writing to the other party and each agrees not to enter into any financing arrangement with any of them without notifying the other party hereto. Financier shall not, and will cause its subsidiaries and affiliates not to contact, directly or indirectly, any Borrower or any guarantor, for the purpose of soliciting or taking away the financial or other services furnished by Lender to the Borrower.

16. In the event Lender should at any time terminate the Financing Agreements for any reason it shall promptly notify Financier thereof and this Agreement shall automatically terminate effective upon the effective date of the termination of the Financing Agreements. In addition, Lender shall have the right to purchase the Participation for the full amount thereof, together with accrued interest and concurrently therewith terminate this Agreement effective at the end of the initial term of the Financing Agreements upon at least thirty (30) days prior written notice. Termination of the Participation Agreement shall not affect the respective rights or obligations hereunder incurred prior to the effective date of such termination including obligations to participate in post-termination Advances in the event of liquidation.

17. This Agreement will be governed by, interpreted and enforced in accordance with the laws of the Province of Ontario and the federal laws of Canada applicable therein. Financier irrevocably attorns and submits to the non-exclusive jurisdiction of the courts of the Province of Ontario with respect to any matters arising out of this Agreement and waives objection to the venue of any proceeding in such court or that such court provides an inconvenient forum.

18. Financier will execute, deliver, file and otherwise assist the Lender in filing any reports, undertakings and other documents required in connection with this Agreement.

19. The following Schedules are incorporated into and form an integral part of this Agreement, and any reference to this Agreement includes the Schedules:

| | |
|---|---|
| Schedule "A" | Client Term Sheet |
| Schedule "B" | Payment Information |

- 6 -

### Assignment

This Agreement becomes effective when executed by all of the parties to it. After that time, it will be binding upon and enure to the benefit of the parties and their respective successors, heirs, executors, administrators and legal representatives. This Agreement is only transferable and/or assignable by the Lender.

### Entire Agreement

This Agreement constitutes the entire agreement between the parties with respect to the transactions contemplated by it and supersedes all prior agreements, understandings, negotiations and discussions, whether oral or written, of the parties. There are no representations, warranties, covenants, conditions or other agreements, express or implied, collateral, statutory or otherwise, between the parties in connection with the subject matter of this Agreement, except as specifically set forth in this Agreement. The parties have not relied and are not relying on any other information, discussion or understanding in entering into and completing the transactions contemplated by this Agreement.

### Time of Essence

Time is of the essence in this Agreement.

### Language of Documents

It is the express wish of the parties to this Agreement that this Agreement and all related documents be drafted in English. Les parties aux présentes conviennent et exigent que cette convention ainsi que tous les documents s'y rattachant soient rédigés en langue Anglais.

### Execution by Facsimile and Counterparts

This Agreement including the schedules may be executed in any number of counterparts (including counterparts by facsimile) and all such counterparts taken together will be deemed to constitute one and the same document.

**IN WITNESS WHEREOF**, the parties have executed this Agreement to be effective as of the day and year first written above.

CREATIVE WEALTH MEDIA FINANCE CORP.

Per: _____
Name:  Jason Cloth
Title:   Authorized Signing Officer

[FINANCIER]

_____
Name: Robert Scot Building Venture, LLC

_____
Name: